## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

CHRISTOPHER DEE JOHNSON,

        Plaintiff,

vs.

TRANS UNION LLC,

        Defendant.

Case No.: 1:24-cv-12289

**JURY TRIAL DEMANDED**

## COMPLAINT

Christopher Dee Johnson ("Plaintiff" or "Mr. Johnson") a living, breathing 49-year-old consumer, brings this action on an individual basis, against Trans Union LLC ("Defendant" or "Trans Union") and states as follows:

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives

the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.    The Defendant communicated to one or more third parties that Plaintiff's name, date of birth, address and social security number were associated

with that of a deceased person which was intended to communicate a high risk of fraud.

13.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

14.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

15.     Christopher Dee Johnson ("Plaintiff" or "Mr. Johnson") is a natural person residing in Herron, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and can be served through its

registered agent Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 65703, and is authorized to do business in the State of Michigan, including within this District.

17.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

20.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

21.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Defendant's Practice Concerning the Sale of Reports on the "Deceased"

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Trans Union, is required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.     Trans Union routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29.     Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with

an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30. Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31. Trans Union does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32. Trans Union does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33. In some cases, in order to assure accuracy, the Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Trans Union does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

34.    The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**.  The DMF is also known commercially as the Social Security Death Index (SSDI).  The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA.  The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA.  The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

35.    Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

36.    Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

37.    The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies.  The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.  The SSA does not guarantee 100% of the data.

38.     The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1] [2]

39.     The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

40.     Trans Union does not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

41.     Despite being a subscriber of the NTIS LADMF, the Trans Union does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

---

[1]  *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*

[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.

[3]  "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

42.    Trans Union will only cross-reference the NTIS LADMF to sell additional products for an additional fee to its subscribers regarding information contained within the LADMF.

43.    Trans Union fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

44.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Trans Union does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

45.    Even in instances where the purportedly deceased consumer communicates directly with Trans Union, Trans Union does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

46.    Once a "deceased" mark is placed upon a consumer's report, Trans Union will not calculate and will not provide a credit score for that consumer.

47.    Upon the Trans Union's reports with a "deceased" mark sold to third parties, Trans Union never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

48.     Trans Union knows that third party credit issuers require a credit score in order to process a given credit application.

49.     Trans Union know that consumers without credit scores are unable to secure any credit from most credit issuers.

50.     Trans Union know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

51.     Trans Union has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Trans Union is inaccurately reporting them as "deceased" and without a credit score.

52.     Trans Union has received and documented many disputes from consumers complaining that Trans Union had erroneously marked them as "deceased" on its credit reports.

53.     The Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

54.     Nevertheless, Trans Union does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

55.    Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

56.    The Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

57.    Nor does the Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

58.    For years after a consumer's actual death, the Trans Union will continue to sell credit reports about that consumer.

59.    The Defendant will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

60.    The Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

61.    The Defendant profits from the sale of reports on deceased consumers.

62.    The Defendant has in its credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

63.    The Defendant knows that truly deceased consumers do not apply for credit.

64.    The Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Trans Union to be a common and major source of identity theft.

65.    The Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

66.    The Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

67.    The Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as

deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

68.     The Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

69.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Trans Union to sell their credit reports, absent a court order.

70.     The Defendant know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for a Mortgage with Community Financial Credit Union**

71.     In or about March 2024 Plaintiff had saved $35,000.00 and was excited to purchase his first home.

72.     On or about March 15, 2024, Plaintiff entered into a purchase agreement to purchase a house located at 900 South 8th Avenue, Alpena, MI 49707 for $118,000.00.

73.     On or about March 24, 2024, Plaintiff was preapproved by Community Financial Credit Union for an $88,000.00 mortgage.

74.     In or around the beginning of April 2024, Plaintiff provided his realtor an $800.00 earnest money deposit to purchase the home.  Additionally, Plaintiff paid approximately $1,500.00 for an appraisal to be performed and approximately $1,500.00 for an inspection to be performed.

75.     Plaintiff was scheduled to close on the house the second week of May 2024.

## Community Financial Credit Union Denies
## Plaintiff's Mortgage Application May 2024

76.      In April 2024, after the appraisal and inspection had been performed, Plaintiff received a telephone call from the loan representative at Community Financial Credit Union.  The Community Financial Credit Union loan representative told Plaintiff that Defendant was reporting him as deceased on his credit report, and consequently, the Defendant was not reporting a credit score for Plaintiff.

77.     In April 2024, Plaintiff went to the Social Security Administration ("SSA") office and confirmed that he was not deceased in their system.

78.     During this visit to the SSA, Plaintiff obtained a letter from the them stating that his social security number was not associated with a deceased record.

79.     Around this same time, Plaintiff applied for a credit card with Capital One.

80.    On or about April 8, 2024, Plaintiff received a letter from Capital One denying his credit application because he did not have a credit score.

81.    Capital One in its April 8, 2024, denial letter stated that its decision was based on Plaintiff's Trans Union credit report.

82.    On or about April 17, 2024, Plaintiff sent dispute letters via certified mail to Defendant Trans Union, Non-Party Experian and Non-Party Equifax.

83.    Plaintiff in his April 17, 2024, dispute letters provided sufficient information to identify himself, including his name, address, date of birth, and social security number.  Plaintiff also included a copy of the letter from the SSA stating that his social security number is not associated with a deceased record.

84.    Plaintiff asked Trans Union, Non-Party Experian and Non-Party Equifax in his April 17, 2024, correspondence to review his credit file and remove any deceased notation.  Plaintiff explained that he was in the process of purchasing a home and this was in jeopardy due to being reported as deceased and as a result not having a credit score.  Plaintiff also explained that he is being denied credit due to being reported as deceased.

85.    On or about April 26, 2024, Plaintiff received a dispute response from Defendant Trans Union stating that Trans Union would not be removing the death benefits message from Plaintiff's credit report.

86.     Plaintiff was in a panic with his house closing approaching.  Plaintiff reached out to the Sellers, and they agreed to extend the closing by two weeks, making the closing now May 25, 2024.

87.     Upon information and belief, Community Financial Credit Union made a credit inquiry to Trans Union concerning Plaintiff on May 17, 2024, and the deceased notation was still present.

88.     When the Sellers learned that Plaintiff's credit issue had not been resolved they withdrew their acceptance of Plaintiff's offer to purchase the house and moved on with another buyer.

89.     Plaintiff was devastated that he was not going to be able to purchase the house.

90.     Plaintiff also lost approximately $3,000.00 from the appraisal and inspection that he already had performed.

91.     In or about June 2024, Community Financial Credit Union notified Plaintiff and his realtor that they could approve the mortgage application. Unfortunately, it was too late since the Seller had already moved on with another buyer.

92.     Due to the Trans Union's inaccurate reporting, Plaintiff was not timely offered the mortgage t to purchase the house he needed.

93.     Plaintiff was forced to continue paying $850.00 a month in rent.

94.     Moreover, Plaintiff has received notice that he must move out in 90 days because the owner of the house he is renting has sold the property.

95.     Plaintiff now must find another place to live, which is extremely difficult in the current real estate market.

96.     Plaintiff does not want to enter a long-term lease, but Plaintiff also does not want to attempt to purchase another house until his credit report is corrected.

97.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

98.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Trans Union's Method for Considering Consumer Credit Report Disputes**

99.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

100.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by

consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

101.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

102.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

103.   Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

104.   Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

105.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

106.   These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

107.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

108.   The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

109.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

110.   Plaintiff reasonably believes that the Defendant continued to publish that he was deceased in the credit reports it issued about him.

111.   As a result of the "deceased" notation, the Defendant made it practically impossible for Plaintiff to obtain credit.

112.   As long as Plaintiff can remember he has been unable to open credit accounts.

113.   Client even had to get a prepaid cellular telephone, which doesn't require a contract, because of his ongoing deceased notation credit issue.

114.   At all times pertinent hereto, Defendant were acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

115.   At all times pertinent hereto, the conduct of Defendant, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

116.   As a standard practice, Trans Union does not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.   Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only

superficial inquiries once the consumer has notified it that information is disputed);
*Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

117.  The Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, the Defendant's violations of the FCRA are willful.

118.  As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures
### to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Trans Union)

119.  Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

120.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

121.   On numerous occasions, Defendant Trans Union prepared patently false consumer reports concerning Plaintiff.

122.   Despite actual and implied knowledge that Plaintiff is not dead, Defendant Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

123.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

124.   As a result of the Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and

emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

125. Defendant Trans Union's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

126. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Trans Union)**

127. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

128. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

129.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

130.    On at least one occasion during 2024, Plaintiff disputed the inaccurate information with Trans Union and requested that it correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, stating that he is "deceased."

131.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

132.    Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

133.    As a result of the Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his

good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

134.   Trans Union's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

135.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Determining that Defendant negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: September 3, 2024

By: /s/Tarek N. Chami
Tarek N. Chami – MI# P76407
CONSUMER ATTORNEYS
22000 Michigan Ave, Suite 200
Dearborn, MI 48124
T: (313) 447-0488
E: tchami@consumerattorneys.com

*Attorneys for Plaintiff,*
*Christopher Dee Johnson*